

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-77,070

**AMOS JOSEPH WELLS, III, Appellant**

**v.**

**THE STATE OF TEXAS**

## ON DIRECT APPEAL FROM CAUSE NO. 1405275R
## IN THE 432ND JUDICIAL DISTRICT COURT
## TARRANT COUNTY

WALKER, J., delivered the opinion of the Court in which KELLER, P.J., and KEASLER, HERVEY, RICHARDSON, NEWELL, KEEL, and SLAUGHTER, JJ., joined. YEARY, J., concurred in the result.

## O P I N I O N

In November 2016, a jury convicted Appellant of capital murder for the 2013 murders of Chanice and Annette Reed committed during the same criminal transaction. TEX. PENAL CODE § 19.03(a)(7)(A). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure article 37.071, sections 2(b) and 2(e), the trial judge sentenced Appellant to

death. TEX. CODE CRIM. PROC. art. 37.071, § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071, § 2(h). Appellant raises thirteen points of error. After reviewing Appellant's points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

## I. OFFENSE AND INVESTIGATION

At 5:39 p.m. on July 1, 2013, upset that his pregnant girlfriend, Chanice Reed, would not answer his calls, Appellant drove to Chanice's house on Pate Street in Fort Worth where she lived with her grandmother, mother, and two younger brothers. Chanice was home with her mother, Annette, and ten-year-old brother, E.M., when Appellant arrived.[2] Chanice's seventeen-year-old brother, K.S., was not at home, but he overheard Chanice and Appellant arguing when he called his mother, Annette, to ask permission to go swimming. K.S. heard Chanice say, "Stop, Amos, you're scaring me."[3] He also heard Annette yelling at Appellant before she ended the call.

Around 6:00 p.m., Annette called her aunt, Joylene Parsons, and asked her to come over. Parsons described Annette as sounding very troubled on the phone and in the background she heard a man yelling at the top of his voice in a "bone-chilling scream."[4] She also heard Annette say, "You

---

[1] Unless otherwise indicated, all future references to Articles refer to the Texas Code of Criminal Procedure.

[2] Because Annette and Chanice share the same last name, we will refer to them by their first names.

[3] Rep. R. vol. 33, 153.

[4] *Id.* at 133.

not going in there."[5] When Parsons asked who was there, Annette replied, "Chanice's boyfriend," whom Parsons knew was Appellant.[6] Annette said, "She got to be the stupidest bitch to open the door to let that fool in," and then, before ending the call, she said, "Come on, come on."[7] Parsons immediately started calling family members who lived nearby. At 6:09 p.m., Annette called 9-1-1 for help. As the 9-1-1 operator was asking questions, Annette reported, "He's going to his truck."[8] And then the phone went dead.

Pascual Martinez, who had been working on a driveway two houses away, heard the commotion and watched as a man and a woman argued loudly in the front yard. He testified at trial that the argument started getting "bad, bad, bad."[9] Martinez saw the man retrieve a handgun from a Chevrolet Tahoe parked in front of the house, return to the yard, and then shoot the woman as she screamed, "No, no, no."[10] He then saw another woman try to bat the gun away before the man shot her, too. Martinez hid at the corner of the house where he was working and heard more shots before the shooter drove off in the Tahoe. Martinez then went to the victims' house and saw a woman, later identified as Chanice, lying outside the front door with her eyes open; she was bleeding and unresponsive. A neighbor arrived and stated that he had called 9-1-1.

The first 9-1-1 call reporting the shootings came in at 6:15 p.m. Responding officers,

---

[5] *Id.*

[6] *Id.* at 133, 134.

[7] *Id.* at 133.

[8] Rep. R. vol. 48, State's Ex. 142 at 00:30.

[9] Rep. R. vol. 33, 81.

[10] *Id.* at 63.

firefighters, and paramedics arrived within minutes. Chanice had been shot four times. One shot entered between her eyes and traveled through the right side of her brain. Another shot entered her lower chest. A third shot entered her left abdomen, injuring her lungs, stomach, aorta, and thoracic spine. The fourth gunshot entered the left side of her back, causing a superficial wound. Paramedics at the scene were not able to save her. Chanice's unborn baby also did not survive. Post-mortem testing revealed that Appellant was the biological father.

Annette had been shot two times. She suffered a large-caliber gunshot wound to her mid-forehead that severed her anterior cerebral artery and came to rest at the base of her brain. Another shot penetrated above her right ear, inflicting enormous brain damage and collapsing her left eye socket and eyeball. Although early responders found Annette on the ground screaming, she died soon after at the hospital.

E.M. had been shot four times. His dead body was found in a hallway inside the house. One shot went through his right ear, entered his neck on the right side, injured his left subclavian vein and lung, and exited his chest through his back. A second shot entered the front of his chest, hit his lower pericardial sac, continued through his diaphragm, liver, interior vena cava, lung, and rib, and exited through his back. A third shot entered the front of his chest and went through his stomach, colon, mesentery, and left iliopsoas muscle before exiting his back. The fourth gunshot entered the back of his left forearm and exited through his front forearm.

The cartridge casings found at the scene were all of the same .9 millimeter caliber and brand. It was later confirmed that they had all been fired from the same gun.

Based on statements from witnesses and family members gathered at the scene, officers focused on Appellant as the prime suspect. At 6:35 p.m., the police dispatcher issued an alert to be

on the lookout for a shooting suspect described as a "black male, 22 years of age, Amos, unknown clothing, possibly occupying a gray or gold Tahoe, last seen eastbound on Wilbarger."[11]

Fort Worth homicide Detective Matthew Barron arrived at the scene at 7:15 p.m. Between 7:15 and 7:25 p.m., responding officer Sean Nguyen entered details gathered from witnesses into the National Crime Information Center (NCIC) database, which generated information associated with Appellant's driver's license. This information included Appellant's full name, driver's license number, date of birth, and Engblad Drive address. Nguyen immediately reported this information to Barron. At 7:48 p.m., Nguyen attached the NCIC return with Appellant's information to the centralized "call sheet" record—an electronic database used to post updates in a developing investigation.

Meanwhile, Appellant called his former girlfriend, Valricia Brooks, with whom he shared a daughter, and told her what had happened. At the time of the call, Brooks was walking in a park with her friend, Brittany Minor, who overheard the conversation. Appellant told Brooks that he had shot and killed Chanice, Annette, and E.M. and that he was thinking about leaving, but he only had one bullet left in his gun and ninety-seven miles remaining before running out of gas. Minor described Appellant as sounding "distraught . . . talking fast, frantic, remorseful, [and] crying."[12] At some point, the call became a three-way conversation between Appellant, Brooks, and Appellant's brother, Amron Wells, whom Appellant had also told about the shootings. Appellant asked Amron to take care of his daughter and indicated that he intended to drive somewhere and shoot himself. Brooks arranged a phone call between Appellant and his daughter, and then told Appellant to turn

---

[11] *Id.* at 44.

[12] Rep. R. vol. 34, 108.

himself in.

At approximately 7:30 p.m., Appellant walked into the Forest Hills Police Department lobby and, in a rambling and incoherent manner, blurted, "Put me in jail; kill me."[13] Noting that Appellant was a "sweaty, big guy, muscular, [and] had a dazed kind of spacey look on him," Sergeant Christopher Hebert handcuffed him as a safety precaution.[14] He described Appellant's demeanor as being "like a calm storm . . . calm demeanor but aggressive," and "look[ing] like he could [] explode any second."[15] Hebert sat with Appellant in the lobby and explained that he could not arrest him without more information. Appellant, using two- to three-word sentences, kept repeating that something bad had happened and that the officers would soon hear about it. Appellant briefly mentioned that he had been in Fort Worth, but he did not provide further details. From tattoos on Appellant's arms, Forest Hills officers eventually discerned his name and birthdate, facts Appellant confirmed. They called the Fort Worth Police Department to inquire further and were told to detain Appellant until Fort Worth officers could pick him up for questioning about a homicide that had happened in Fort Worth that evening.

Fort Worth officers transported Appellant to a Fort Worth police station where Detectives Barron and Tim O'Brien attempted to interview him around 8:35 p.m. Without reading *Miranda*[16] warnings, Barron began by asking Appellant routine questions such as his name, birthdate, and address, all of which Appellant provided. He then asked Appellant questions such as: what he had

---

[13] *Id.* at 120.

[14] *Id.*; Rep. R. vol. 5, 22–23.

[15] Rep. R. vol. 5, 21, 23.

[16] *Miranda v. Arizona*, 384 U.S. 436 (1966).

done that day; why he went to the Forest Hills station; whether he had been on Pate Street; and what had happened on Pate Street. Appellant denied being on Pate Street that day. When Barron asked Appellant to tell him what had happened on Pate Street, Appellant stated repeatedly, "You tell me what happened." After forty-one minutes of questioning and an eight-minute break without obtaining useful information, the detectives stopped Appellant's interview and focused on interviewing other people who had been asked to provide statements at the station. By 1:00 a.m. on July 2, Barron determined that he had probable cause to arrest Appellant and search his residence. Barron obtained a search warrant for Appellant's residence at 1:55 a.m.

Evidence gathered in the search included: an undegraded empty cardboard .9 millimeter ammunition box found in a toilet tank; an opened .9 millimeter ammunition box that contained thirty-eight of fifty unspent cartridges matching the spent cartridge casings found at the crime scene; a gun magazine loaded with thirteen .9 millimeter rounds; an otherwise empty plastic handgun case that contained a single unspent .9 millimeter round; and a home security system control box, which contained time-stamped video recordings depicting four different camera angles of the driveway and front door areas. Video from one of the cameras showed Appellant backing out of the driveway alone in his Tahoe at 5:39 p.m. on July 1, shortly before the offense. The same video showed Appellant's brother returning alone in the Tahoe at 7:16 p.m.

After the search, Barron obtained an arrest warrant at 4:00 a.m. Barron returned to Appellant's interview room at 4:20 a.m. and informed him that he was being charged with capital murder. Barron read Appellant his *Miranda* rights, which Appellant waived. Barron then re-interviewed Appellant. Appellant broke down crying and eventually confessed in detail to the murders of Chanice, Annette, and E.M. Around 2:22 p.m., Barron obtained a search warrant for

Appellant's Tahoe. That search revealed gunshot residue on the leather steering wheel cover. The gun used in the offense was not recovered.

## II. MOTION TO SUPPRESS

In his first three points of error, Appellant asserts that the trial court erroneously denied his motion to suppress evidence obtained in the searches of his house and vehicle. Appellant argues that the search warrants were based on information illegally obtained from an unconstitutional interrogation in violation of the Fourth and Fourteenth Amendments to the United States Constitution; Article I, Sections 9 and 10 of the Texas Constitution; and Article 38.23 of the Code of Criminal Procedure. Briefing the three points together, Appellant specifically alleges that the search evidence was "fruit of the poisonous tree" because Barron learned Appellant's name and address in an un-*Mirandized* interrogation, which he then incorporated into the search warrant affidavits used to support probable cause.

Appellant filed a pre-trial motion to suppress the evidence obtained in the house and vehicle searches.[17] The trial court denied Appellant's motion to exclude the evidence and found that the information Barron incorporated into the search warrant affidavits "originated from sources and investigations other than by and prior to the defendant's responses" to Barron's initial questions at the Fort Worth station.[18] In relevant part, the trial court specifically found that Barron learned Appellant's name and address at the crime scene before he met with Appellant. It therefore

---

[17] Appellant also filed a related motion to suppress his oral and written statements. The parties argued the motions together at a pre-trial hearing, and the trial court addressed them together in its findings of fact and conclusions of law. On appeal, Appellant does not challenge the trial court's denial of the motion relating to the statements.

[18] Rep. R. vol. 33, 8–9; Clerk's R. 758.

determined that the evidence obtained in the searches was admissible.[19]

"We review a trial court's denial of a motion to suppress for an abuse of discretion and apply a bifurcated standard of review, affording almost complete deference to the trial court's determination of historical facts, especially when those determinations are based on assessments of credibility and demeanor." *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016). We review *de novo* mixed questions of law and fact that do not hinge on assessments of credibility or demeanor. *Brodnex v. State*, 485 S.W.3d 432, 436 (Tex. Crim. App. 2016). "If the ruling of the trial court is correct under any applicable theory of law, we will sustain its ruling." *Furr*, 499 S.W.3d at 877.

As a preliminary matter, we note that Appellant's claims rely on the premise that a *Miranda* violation (a potential Fifth Amendment violation) can lead to the exclusion of evidence—other than the unwarned statements—under Article 38.23 or the Fourth Amendment. We expressly rejected this avenue for relief in *Baker v. State*, stating that "mere violations of the *Miranda* rule are not covered by the state exclusionary rule contained in Article 38.23." *Baker v. State*, 956 S.W.2d 19, 24 (Tex. Crim. App. 1997). The Supreme Court, too, has repeatedly emphasized that the "'complete and sufficient remedy' for any perceived *Miranda* violation" is exclusion of the unwarned statements. *United States v. Patane*, 542 U.S. 630, 641–42 (2004) (quoting *Chavez v. Martinez*, 538 U.S. 760, 790 (2003) (Kennedy, J., concurring in part and dissenting in part)).

Further, even though a statement taken in violation of *Miranda* must be suppressed at trial,

---

[19] The trial court also found admissible Appellant's statements made during his consensual encounter at the Forest Hills station, but only until Appellant was detained at the direction of Fort Worth authorities. The trial court suppressed the statements Appellant made from the time of his detention at the Forest Hills station until he waived his *Miranda* rights at 4:20 a.m. on July 2 in the Fort Worth interview room.

other evidence subsequently obtained as a result of that statement (i.e., the "fruits" of the statement) need not be suppressed. *Baker*, 956 S.W.2d at 22 (citing *Oregon v. Elstad*, 470 U.S. 298, 314 (1985), and *Michigan v. Tucker*, 417 U.S. 433, 452 (1974)). The fruits of a defendant's statement need only be suppressed when the statement is obtained through actual coercion—which Appellant has not alleged, nor have we found in our review of the record. *See id.* (citing *Elstad*, 470 U.S. at 314, and *Tucker*, 417 U.S. at 448–49).

The court below rejected Appellant's suppression motion in part on its finding that Barron learned Appellant's name and address from an independent source before he interviewed him. This finding was supported at the suppression hearing by testimony and documents. The documents included handwritten notes from the scene, the call sheet record documenting the time stamps of the NCIC inquiry, and Nguyen's posting of its return, all of which preceded Barron's un-*Mirandized* interview. The trial court concluded that this prior independent knowledge foreclosed relief under the "independent source doctrine." *See generally Wehrenberg v. State*, 416 S.W.3d 458, 464–73 (Tex. Crim. App. 2013) (adopting federal independent source doctrine and holding that, despite prior illegality, evidence lawfully obtained from an independent source was not "obtained" in violation of the law and was not subject to suppression under Article 38.23); *see also Segura v. United States*, 468 U.S. 796, 813–15 (1984) (establishing that, notwithstanding prior unlawful police conduct, evidence seized pursuant to a valid warrant informed by an independent source was not subject to exclusion); *Nix v. Williams*, 467 U.S. 431, 443 (1984) (providing that evidence obtained from a lawful source, separate from any illegal conduct by law enforcement was not subject to exclusion).

We conclude that the trial judge did not violate the Constitution or abuse his discretion in overruling the motion to suppress evidence. Points of error one through three are overruled.

## III. MITIGATION – INTERVIEW ROOM VIDEO

In point of error four, Appellant asserts that the trial court erred when it refused to admit at the punishment phase the interview room video of Appellant at the Fort Worth station on the night of the offense. Appellant alleges that the video contains constitutionally relevant mitigating evidence that shows "[a]ppellant's mental condition and how he was acting immediately after the crime."[20]

### A. Background Facts

Defendant's Exhibit 81 is an eight-hour video of Appellant in the Fort Worth station interview room on the night of the offense. It includes three broad segments: first, Appellant's initial interview upon arrival at the station, which lasted about one hour; second, a six-hour span during which Appellant was essentially left alone throughout the night; and third, Appellant's second and final interview. The video runs from approximately 8:19 p.m. to approximately 5:26 a.m. the next morning when the second interview ended. At issue is the six-hour video segment between the two interviews. This segment runs from about 9:25 p.m. until 4:22 a.m. the next morning.

The complained-of segment reflects that, after the detectives left the interview room, Appellant repeatedly made statements like: "This is too weird"; "This is a dream I know it is"; "Why? Why?"; "Wake up"; "This is too weird"; and "This is a dream."[21] He also ran his hands along the table and walls of the room. This continued for about fourteen minutes until an officer entered to take his shoes, shorts, and shirt. After the officer left, Appellant made similar statements for approximately five minutes. After that, Appellant sporadically repeated that he was in a "crazy

---

[20] Appellant's Br. 73.

[21] Rep. R. vol. 50, Defendant's Ex. 81 at 21:25–04:21, *passim*.

dream" and that he needed to "wake up."[22] Aside from these comments, however, the majority of the video consists of Appellant pacing around the room, scribbling on a whiteboard, sitting or apparently sleeping in a chair or on the floor for long stretches of time, drinking water, and taking restroom breaks. At approximately 3:20 a.m., Appellant ate food that Barron brought to him before his second interview.

During the punishment phase, and outside the jury's presence, Appellant sought to admit the interview room video in its totality through Barron's testimony to show Appellant's mental condition after the shootings. Defense counsel argued that he wanted "to show the jury that [Appellant] was acting strange, for lack of a better explanation."[23] He also argued that he was "trying to show that [Appellant] was making statements that were odd, if – if you will."[24] He argued that a jury might find Appellant's demeanor in the interview room mitigating.

The State argued in response that the video's contents were inadmissible self-serving hearsay under *Allridge v. State*—a case in which we upheld a trial court's guilt-phase refusal to admit as hearsay a defendant's revised written statement, in which he claimed to have shot the victim in a panic rather than intentionally. *Allridge v. State*, 762 S.W.2d 146, 152–54 (Tex. Crim. App. 1988). Appellant's counsel distinguished *Allridge* by pointing out that Appellant was offering the video at the punishment phase rather than at the guilt phase. Counsel also noted that he was not offering the video for the truth of the matter asserted, but rather to show Appellant's actions and behavior while Barron was not in the room. Counsel emphasized that he was offering the video to show Appellant's

---

[22] *Id.*

[23] Rep. R. vol. 45, 15–16.

[24] *Id.* at 18.

"condition mentally," but not as it related to competency or sanity.[25] Counsel did not offer video excerpts as an alternative.

The trial court excluded the video without explanation. Excerpts from the ensuing exchange, however, show that the trial court expressed evidentiary concerns about the relevance and the cumulative nature of the video:

> [DEFENSE COUNSEL]: I'm not saying it makes him insane or incompetent to have given the statement, but it's just for the purpose of the way he was acting immediately after the shootings.
>
> THE COURT: So why is that relevant?
>
> [DEFENSE COUNSEL]: Because we believe it's mitigating . . . I'm not offering it for whether the Defendant confessed or not . . . but it does show the Defendant's mental condition, so we believe it's relevant.[26]
>
> * * *
>
> THE COURT: . . . Okay. Because he was acting strange, in your opinion, why is that important for the jury to consider?
>
> [DEFENSE COUNSEL]: Judge, it might be something that one of the jurors views as mitigating that this defendant was under some distorted emotional sense. I'm not offering it for insanity or for incompetency[.]
>
> * * *
>
> THE COURT: . . . I appreciate what you're arguing, but I'm also dissecting what you're telling me. Now, when you — what you've explained is that he's acting strangely and that should be heard by the jury. The jury has already heard those things and the — through other witnesses thus far through the panoply of people that have already testified about his behavior[.][27]

---

[25] *Id.* at 13.

[26] *Id.* at 13–14.

[27] *Id.* at 16.

Ultimately, the trial court announced that it had "concluded to exclude the recording of [Appellant] while not being interviewed but being detained at the Fort Worth Police Department contained in the Defendant's Exhibit."[28]

**B. Constitutional Standard**

In a capital sentencing trial, "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also Eddings v. Oklahoma*, 455 U.S. 104, 113–14 (1982); *see also* Art. 37.071, § 2(a)(1) (providing that, during a capital trial, evidence may be presented "as to any matter that the court deems relevant to sentence, including evidence of the defendant's background or character or the circumstances of the offense that mitigates against the imposition of the death penalty"). Mitigating evidence is relevant if it has "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990)); *see also Ex parte Smith*, 309 S.W.3d 53, 56 (Tex. Crim. App. 2010) (discussing low relevance threshold); TEX. R. EVID. 401. Once the threshold test for relevance is met, the trial court should admit evidence that a juror could reasonably find warrants a sentence less than death and must allow for consideration of the mitigating evidence. *Tennard*, 542 U.S. at 285.

While "virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances," *Payne v. Tennessee*, 501 U.S. 808, 822 (1991),

---

[28] *Id.* at 20.

the Supreme Court has never held that a state court must admit any and all proffered mitigating evidence no matter how irrelevant, unreliable, or cumulative.

> *Lockett* and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be part of the sentencing decision at all.

*Johnson v. Texas*, 509 U.S. 350, 361 (1993) (quoting *McKoy*, 494 U.S. at 456 (Kennedy, J., concurring in judgment)). And while States may not apply their evidentiary rules "mechanistically to defeat the ends of justice," *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), "the Eighth Amendment does not deprive the State of its authority to set reasonable limits upon the evidence a defendant can submit, and to control the manner in which it is submitted." *Oregon v. Guzek*, 546 U.S. 517, 526 (2006); *see also Boyde v. California*, 494 U.S. 370, 377 (1990) ("States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'") (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 181 (1988) (plurality opinion)); *see, e.g., Johnson*, 509 U.S. at 362; *Buchanan v. Angelone*, 103 F.3d 344, 349 (4th Cir. 1996) (holding that the trial court's application of Virginia's hearsay rule to exclude evidence did not rise to the level of a constitutional violation because, *inter alia*, "the statements would have had only cumulative probative value").

Accordingly, we have stated that the jury may consider a defendant's mental condition as a mitigating factor in a capital punishment case. *See, e.g.*, *Ex parte Granviel*, 561 S.W.2d 503, 516 (Tex. Crim. App. 1978). The federal constitution, however, does not require the admission of mitigating evidence that is otherwise objectionable under state law. *Jenkins v. State*, 493 S.W.3d 583, 608 n.67 (Tex. Crim. App. 2016); *see also Valle v. State*, 109 S.W.3d 500, 507 (Tex. Crim.

App. 2003) ("The fact that appellant was not able to present his case in the form he desired does not amount to constitutional error when he was not prevented from presenting the substance of his defense to the jury.").

**C. Analysis**

Appellant argues that the full video, complete with the six-hour segment in between the two interviews, should have been admitted because it consisted of relevant mitigating evidence. According to Appellant, the video would have shown his general mental condition shortly after the offense, and his mental condition is relevant to the mitigation issue by showing that he was acting strangely and acting under some distorted emotional sense. The State argues that the trial court correctly excluded the full video for three reasons: (1) the excluded portion was irrelevant; (2) the excluded portion consisted of hearsay; and (3) the excluded portion was self-serving.

In the alternative, the State argues that even if the trial court erred in excluding the full video, the error is harmless because Appellant was able to present other evidence that was more probative of his mental state following the offense. The State also urges that the mitigating value of the excluded portion of the video is slight in light of the entire record. As a result of both of these factors, the full video's exclusion could not have affected the jury. Based upon our review of the record, we agree.

**C(I). Harmless Error**

Because the erroneous exclusion of relevant mitigating evidence offered by a defendant facing a possible death sentence implicates the Eighth Amendment, we analyze the error for constitutional harm under Texas Rule of Appellate Procedure 44.2(a). *See Renteria v. State*, 206 S.W.3d 689, 698 & n.7 (Tex. Crim. App. 2006) (applying Rule 44.2(a) harmless error analysis to

erroneous exclusion of mitigation evidence); *Tennard v. Dretke*, 542 U.S. 274, 284–87 (2004). Under Rule 44.2(a), a constitutional error subject to harmless error review must be reversed unless the reviewing court determines, beyond a reasonable doubt, that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a). In applying the harmless error test, reviewing courts are to "ask whether there is a 'reasonable possibility' that the error might have contributed to the conviction or punishment." *Love v. State*, 543 S.W.3d 835, 846 (Tex. Crim. App. 2016). The analysis should not focus on the propriety of the outcome at trial. *Id.*; *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007). "[T]he question for the reviewing court is not whether the jury verdict was supported by the evidence." *Scott*, 227 S.W.3d at 690. "Instead, the question is the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at that verdict." *Id.* In other words, the reviewing court asks whether "the error adversely affected 'the integrity of the process leading to the conviction.'" *Id.* (quoting *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989)). To that end, the reviewing court "should calculate as much as possible the probable impact of the error on the jury in light of the existence of other evidence." *Love*, 543 S.W.3d at 846. Stated alternatively, "the reviewing court must ask itself whether there is a reasonable possibility that the . . . error moved the jury from a state of non-persuasion to one of persuasion on a particular issue." *Scott*, 227 S.W.3d at 690. A ruling that an error is harmless is, in essence, an assertion that the error could not have affected the jury. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000).

In deciding whether an error of constitutional dimension contributed to the conviction or punishment, factors to consider include, but are not limited to, the nature of the error (e.g., erroneous admission or exclusion of evidence, objectionable jury argument, etc.), whether the error was

emphasized by the State, the probable implications of the error, and the weight the jury would likely have assigned to the error in the course of its deliberations. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011); *Love*, 543 S.W.3d at 846. Furthermore, the presence of overwhelming evidence supporting the jury's verdict can also be a factor in the harmless error calculation. *Motilla v. State*, 78 S.W.3d 352, 357 (Tex. Crim. App. 2002). Reviewing courts are to take into account any and every circumstance apparent in the record that logically informs the harmless error determination, and the entire record is to be evaluated in a neutral manner and not in the light most favorable to the prosecution. *Love*, 543 S.W.3d at 846.

The State, as the beneficiary of the error, has the burden of proving that the constitutional error was harmless beyond a reasonable doubt. *Williams v. State*, 958 S.W.2d 186, 194 n.9 (Tex. Crim. App. 1997); *Deck v. Missouri*, 544 U.S. 622, 635 (2005) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

### C(II). Impact on Ability to Present Mitigating Evidence

The State, seeking to meet this burden, points out that other evidence was presented to the jury that would show Appellant's mental state shortly after the offense. As the trial court noted, a "panoply of people . . . already testified about his behavior"—his post-offense mental state and strange behavior—in the time period after the offense and before the video.[29] For example, the jury saw the video of Appellant walking into the Forest Hills station. During the playing of the video, an officer described Appellant's strange trance-like demeanor and use of two- to three-word sentences asking to be shot and arrested. The jury heard details about Appellant's phone conversation with Brooks immediately after the shootings. Brooks's friend, Brittany Minor, overheard their

---

[29] Rep. R. vol. 45, 16.

conversation and observed that Appellant sounded distraught, was talking fast, seemed frantic and remorseful, and was crying. The jury also heard testimony that Appellant drove around for an hour after the murders and contemplated fleeing and committing suicide.

These events occurred two to three hours before the interview room video segment, and arguably better reflected Appellant's mental state immediately after the offense. The excluded video segment spanned six hours and showed Appellant engaging in mundane activities such as sleeping, sitting, and pacing. Although the full video would have also shown his mental state, and its exclusion prevented Appellant from putting all of his mental state evidence in front of the jury, the erroneous exclusion had no impact on Appellant's ability to show the jury his mental state shortly after the offense.

### C(III). Impact on the Overall Mitigation Case

Furthermore, the State argues that the excluded video segment, both alone and in context, had little value to Appellant's mitigation case which was premised on a theory that Appellant had a propensity for violence due to factors beyond his control, including genetics, his brain structure, and his childhood environment. During the punishment phase, Appellant presented testimony from several doctors who evaluated him before trial, family members, others who interacted with him, and even himself.

Appellant's punishment witnesses began with various family members and others who had interacted with him. First, Appellant presented testimony from his half-brother, also named Amos Wells. Appellant's half-brother was diagnosed by MHMR of Tarrant County at the age of five with attention deficit disorder (ADD), depression, and bipolar disorder. Appellant's half-brother, who never lived with Appellant, testified that Appellant was treated well by his mother and stepfather and

was happy growing up in the home.

Carolyn Russell, Appellant's maternal grandmother, testified that she was diagnosed with schizoaffective disorder at age eighteen because she heard voices and saw things, and she was hospitalized on several occasions. She takes Risperdal and Clonazepam. Russell testified that Appellant's mother (Twyla Franklin), Appellant's stepfather (Randy Franklin), and Appellant were "just a big happy family."[30] She said Appellant was loved and cared for, and she never saw Appellant mistreated.

Antonio Lewis, Appellant's maternal uncle, testified that although he did not have much contact with Appellant, when he did meet with Appellant at family gatherings Appellant seemed to be a respectful young man and a proud father. Lewis made no mention of any mental issues or violence.

Dr. Shashi Motgi, a child and adolescent psychiatrist, treated Appellant at MHMR of Tarrant County for psychiatric issues in 1999 when he was about nine years old. She prescribed Appellant Ritalin and Imipramine, an antidepressant medication often used with children who have attention deficit hyperactivity disorder (ADHD). She testified that young children diagnosed with ADHD have a history of being very impulsive and reactive. Although they have free will and the ability to choose how to act, they can control their decisions less than a person without the condition. A person is generally born with ADHD; there is a genetic reason for it.

Renee Jimmerson, a first-grade school teacher who had taught Appellant's daughter,

---

[30] Rep. R. vol. 38, 217.

described, over the State's objection,[31] an incident where, one day in class, Appellant's daughter was not having a very good day, threw a temper tantrum, messed up some desks, and threw things all over the floor.

Carol Lee, a retired elementary school teacher, testified that Appellant was a student of hers in a "behavior improvement class."[32] Although Appellant was academically sound, she felt "a sense of anger" that she believed was due to the breakup of Appellant's parents.[33] Appellant did not have any disciplinary problems, but there was one incident during a restroom break in which another student, not in the behavior improvement class, falsely accused Appellant of trying to enter a restroom stall occupied by the other student. This accusation left Appellant "a little angry."[34]

August Klinkenberg counseled eight-year-old Appellant at MHMR of Tarrant County three times during a five-week period between April and June 1998. Appellant, who had been receiving mental health services for some time, saw a psychiatrist, followed up with nurses for medications, and saw counselors. During the time Klinkenberg counseled Appellant, he was twice suspended from school for fighting and for kicking his teacher.

Ruby Williams, a confinement officer for the Tarrant County Sheriff's Office, testified about Appellant's time in the Tarrant County Jail. According to Williams, Appellant was a compliant inmate that would do whatever he was asked. He never made any problems and did not have a bad

---

[31] Appellant argued that Jimmerson's testimony was relevant to show Appellant's genetic predisposition to violence by showing his daughter inherited the same characteristic.

[32] Rep. R. vol. 39, 43.

[33] *Id.* at 46.

[34] *Id.* at 50.

attitude. Instead, Williams's experiences with Appellant were positive.

Letrinda Lee, Appellant's maternal aunt, testified that she and Appellant's mother, Twyla, lived with their grandmother (Appellant's great-grandmother) growing up because of Russell's mental health issues. According to Letrinda, Appellant's childhood home was chaotic because his parents constantly fought physically and verbally in front of the children; she could tell that it troubled and disturbed Appellant. Letrinda and Twyla both have had ADD and depression since they were young. Twyla even attempted suicide as a young girl. Letrinda testified that Appellant was troubled and had a temper as he got older. After Appellant's parents separated, Appellant's contact with his father "dwindled."[35]

Appellant's case then shifted towards expert testimony from various doctors who opined about conditions that predisposed him to violence. Dr. Antoinette McGarrahan, a forensic psychologist and neuropsychologist, evaluated Appellant for the defense. In four visits with Appellant for a total of approximately ten hours, Dr. McGarrahan administered a battery of psychological tests to examine parts of Appellant's brain that are used for memory, attention, concentration, language ability, and problem solving. Appellant was able to complete the tests in the appropriate manner and did not have any indications from the tests that he had any cognitive difficulties or brain impairment. In short, Dr. McGarrahan did not find anything wrong with Appellant's brain, did not find him impaired, and determined that he is average or above average for his age in intelligence. Dr. McGarrahan also determined Appellant's judgment was intact and that the frontal part of his brain was functioning allowing him to make good decisions and use good judgment.

---

[35] *Id.* at 118.

Dr. McGarrahan also tested Appellant on his emotional thinking and emotional judgment. Dr. McGarrahan determined that Appellant had some problems with depression and anxiety, but those problems did not rise to the level of severe mental illness or a major depressive disorder. Dr. McGarrahan gathered that Appellant has a level of suspicion that is quite paranoid when interacting with other people, particularly with strangers and people he is not close to. This suspiciousness makes him a hostile person. Dr. McGarrahan determined that Appellant:

> perceived things that go wrong in his life as being somebody else's fault, not his own fault, not -- he doesn't see himself as contributing to the negative things that happen in his life. And from an early age, his mental health records show around the age of six that he would read negative or bad meaning into benign remarks. He would feel that he had been slighted or treated unfairly dating back to early childhood.[36]

His records showed aggression and repeated problems with anger and violence from an early age. At six years old, Appellant kicked teachers, punched his peers, and turned over desks and chairs. Appellant has the potential to respond with acute outbursts of rage if he feels threatened, even if the threat is unintended or nonexistent.

On cross-examination, Dr. McGarrahan reaffirmed that Appellant is paranoid and thinks the world is out to get him, and he reacts accordingly. Regarding Appellant's depressive symptoms, Appellant would be considered to have low grade depression. Although Appellant had no conscious memory of domestic violence between his mother and father, Dr. McGarrahan opined that it nevertheless affected him. Appellant denied being physically or emotionally abused as a child. He blames the world for his problems, which can be a learned behavior if someone is taught that nothing is his fault. Appellant saw a psychiatrist and was treated with medication from age six to nine. When Appellant was ordered to attend a batterers' intervention program after he assaulted Brooks in 2008,

---

[36] Rep. R. vol. 40, 83.

he did not complete the program, and he continued to abuse women and to blame the victim for his actions.

Amos Wells, Jr., Appellant's father, testified about the family's chaotic and unstable early years. He went to federal prison after dropping off four-year-old Appellant on his first day of pre-kindergarten, so he was unable to keep his promise to pick up Appellant after school. Before he returned home about a year later, Twyla had already moved on and filed for divorce. Nevertheless, he and Twyla tried unsuccessfully to reconcile, and there was a lot of turmoil, yelling, screaming, and fighting in the household during that time. After Appellant's parents divorced, his father worked hard to provide his children with anything they needed or wanted. Appellant's father testified that Randy Franklin, Appellant's stepfather, did a good job of stepping in to fill the void and provide Appellant with emotional support.

Dr. William Bernet, a forensic psychiatrist, testified that Appellant has a low-activity variant of the Monoamine Oxidase A (MAOA) gene. This gene influences serotonin to the brain, which affects depression, anxiety, aggression and violence, and suicidal tendencies. A person with the low-activity variant of the MAOA gene, and thus low levels of serotonin to the brain, has an increased risk of being a violent adult if that person has an adverse or traumatic childhood. Dr. Bernet opined that Appellant suffered such events when he witnessed domestic violence between his parents and when his father went to prison. Dr. Bernet further opined that his theory was supported by Appellant's history of getting angry and out of control throughout childhood, adolescence, and young adulthood. Dr. Bernet concluded, "[w]ith a reasonable degree of medical and scientific certainty," that Appellant's genetics and history of childhood mistreatment increased the probability that

Appellant would act in a violent or maladaptive manner.[37]

Dr. Jeffrey Lewine, a neuroscientist, next testified regarding Appellant's brain. He explained that an MRI scan of Appellant's brain was taken. The MRI did not reveal any abnormalities; it showed that Appellant's brain was within normal limits. Dr. Lewine cautioned, however, that while an MRI is good at finding brain tumors, it is not good at identifying certain types of abnormalities such as epilepsy, post-traumatic stress disorder, and autism. Dr. Lewine compared Appellant's brain to a normative control group from a large database of individuals without neurological or psychiatric conditions, history of substance abuse, or learning disability. Appellant's brain was compared to 212 brains matched for age and sex. Compared to a normal brain, the neuron density in Appellant's brain is statistically reduced. Dr. Lewine was very confident—"confident to 99.99 percent"—that Appellant's brain is statistically different from a neurotypical population.[38] Comparing specific regions of the brain, Dr. Lewine determined that 38 out of 116 regions of Appellant's brain showed statistically significant reductions in volume. Appellant's brain is normal in areas involved in memory and executive function—his ability to think and make decisions. Appellant's brain is significantly abnormal in the parts of the brain involved in visual information processing,[39] emotional regulation of behavior, and impulse control. He would have difficulty stopping behaviors based on what has happened emotionally. Dr. Lewine also examined the functional integrity of the connections in Appellant's brain and found the connections in Appellant 's brain were statistically

---

[37] Rep. R. vol. 43, 117.

[38] Rep. R. vol. 44, 26.

[39] Dr. Lewine explained that Appellant has difficulty processing "face information," recognizing emotional content on faces. Dr. Lewine distinguished this from the ability to recognize a person by their face, which is related to memory.

abnormal. Using a behavioral test, Dr. Lewine determined that Appellant showed an inability to inhibit and control his behavior based on the information he is presented. On cognitive ability, Dr. Lewine concluded that Appellant's cognition was normal based on Dr. McGarrahan's previous testing and on further testing he requested of Dr. McGarrahan. In addition, based on an electroencephalography (EEG), Dr. Lewine found increased beta activity, which is associated with anxiety and impulse control issues; Appellant has the profile of a person with an inability to "sensory gate information," which can lead to sensory overload.[40] Dr. Lewine explained that the structural abnormalities in Appellant's brain were not going to improve. However, there are certain medications that can potentially help. Dr. Lewine agreed that Appellant had no control over his genetics or his childhood environment. He concluded that, if faced with the same circumstances leading up to the offense, Appellant could have the same response given the right stressors and the right circuitry of his brain.

Dr. Jolie Brams, a clinical and forensic psychologist, testified about the negative effect on Appellant caused by his family's mental health history and by traumatic events in his childhood. Dr. Brams examined documentation of the offense, Appellant's mental health and history, and the mental health and history of Appellant's family. Dr. Brams also spent about fourteen and one-half hours conducting multiple interviews with Appellant and his family members. Dr. Brams looked at Appellant's situation using the "complex developmental trauma" framework, which is similar to posttraumatic stress disorder but is more toxic and more broad based than being based upon one

---

[40] Rep. R. vol. 44, 62.

event.[41] Dr. Brams determined that Appellant's developmental opportunities were impaired in very significant ways, and Appellant did not have a foundation of trust of stability in his family.

One of the problematic factors identified by Dr. Brams was Appellant's mother, Twyla's, long history of major depression and attention deficit disorder and environmental problems in her life. Additionally, her own family that did not teach her how to parent children. Appellant's maternal grandmother, Russell, has an extensive and serious history of mental illness, including diagnoses with schizophrenia and schizoaffective disorder. Russell did not have the ability to raise Twyla as she was not around very much, was a drug addict for many years, and had many men in her life. Twyla, in turn, gave birth to Appellant at a very young age, had been suicidal when she was young, and has a lot of mental health problems herself. Twyla's maternal depression had a very strong impact on Appellant's ability to get the resources that he needed as a child and to develop a trusting relationship with others. Furthermore, because paranoia was a part of Twyla's depression, she has a profound lack of trust in the world. Throughout the course of Appellant's life, beginning at infancy, his mother conveyed to him a negative sense of the world and that the world was not a safe place. Depressed mothers cannot give children the protection and predictability they need.

Another significant factor in Appellant's life is that his father was narcissistic. Narcissistic parents do not look at their child as a person, they treat their child as a possession. When a child has a narcissistic parent, the child feels anger all of the time because the child's needs are not met. The narcissistic parent only responds to their own needs. The child in such a situation develops "learned

[41] Dr. Brams added that complex developmental trauma was considered for inclusion in the most recent version of the Diagnostic and Statistical Manual (DSM), but was instead included as a category of posttraumatic stress disorder for children.

helplessness."[42] Children of narcissistic parents have feelings of powerlessness and anger, and they have attachment issues because they want to attach to a parent that does not have the capacity to attach back except in very superficial ways. Appellant's father was significantly narcissistic. This, combined with a depressed and paranoid mother, had a very negative impact on Appellant's development.

In addition, Dr. Brams found evidence that Appellant observed domestic violence between his father and his mother, and then between his stepfather and his mother. Another significant event was his father's imprisonment when Appellant was in preschool, disappearing abruptly at a critical time when children rely on the security of family to master the world around them. Appellant's childhood school records show that he developed significant behavioral problems and emotional problems starting from about the time his father was incarcerated. Appellant was diagnosed with ADHD and oppositional defiant disorder (ODD). Although he was never diagnosed with depression, Randy and Twyla filed parental reports that he was depressed. In school, Appellant was placed in special education for behavioral problems. Dr. Brams opined that these issues were symptoms of Appellant's childhood trauma, and treatments for ADHD and ODD were only focusing on the symptoms and not the underlying cause. Another issue that impacted Appellant was the numerous times Appellant changed school. A high degree of school mobility not only disrupts education but also school engagement and becoming part of a larger community. With at least 10 or 12 different changes, Appellant did not have a school community that could support him to develop peer relations.

Randy Franklin, Appellant's stepfather, testified he came into Appellant's life in 1989 when

---

[42] Rep. R. vol. 44, 122.

Appellant was eight years old. Randy explained that as a child Appellant had a difficult time with his emotions. Randy and Twyla thought Appellant was hyper. Randy said Appellant was up-and-down; when Appellant was active, such as when playing sports, he was very happy. On the other hand, Appellant had times where he was unhappy to the point of crying for no reason. Randy explained that, although Appellant's biological father provided financial assistance, he failed to support the children emotionally, to show up to planned events, or to keep promises to take the children somewhere. As a teenager, Appellant tried to bury the hurt and pain that resulted. Randy tried to be a role model, and he taught Appellant what it was like to go to church and how to treat others. Appellant had two loving parents in the home, and Twyla was always there to also help, protect, and support Appellant. Randy and Twyla did have a lot of verbal fights and disagreements, but he never slapped or hit her. On hearing testimony during the State's punishment case about Appellant's prior assaults on Brooks, Randy said that he was not surprised that Appellant assaulted Brooks because they argued a lot and Appellant would get very angry at times. Randy was also not surprised that Appellant was involved in a number of assaults while in jail, because Appellant has a problem with controlling his anger.

Appellant's mother, Twyla, testified about her mental health problems,[43] including her suicide attempt when she was young and a second suicide attempt a year before Appellant's trial. For her ADD, she takes Seroquel, Celexa, and Concerta. She still suffers from depression, and she still hears voices in her head. She disputed others' characterization of her hearing voices as crazy;

---

[43] During the State's punishment case, Brooks testified that Twyla is "unstable" with "no sense of wrong and right." Rep. R. vol. 37, 106. Brooks added that Twyla "causes confusion" and is confrontational even when it is unnecessary. *Id.* at 108.

instead, the voices are real and were "God and His angels" speaking to her.[44] On the subject of Appellant's mental health, Twyla said Appellant disrupted class and was given Ritalin and Methylene at school. She did not give Appellant those medications at home, however, because the drugs made him "like a zombie."[45] Appellant was always sad and counseling did not help him. He got into fights because people bullied him and called him names.

Appellant's last witness was himself. He testified generally about his childhood, where he lived, and who he lived with. Regarding his father, Appellant stated that he had no memory of the incident where his father dropped him off at school and did not come back to pick him up. Appellant only remembered that his father disappeared. Appellant also testified that he did not stay in any elementary school for a significant period of time but moved around from school to school. The family moved around frequently during his childhood until they eventually made it to the Engblad Drive address he was living in at the time of the offense. He had friends, but he did not get too close to anyone because he never lived in one place for very long. Appellant stated that, while Twyla loved him, she was not ready to raise children. Twyla battled depression and was emotionally unstable. She would be okay one moment and the next day she would be running around with a braided leather belt beating him because he did something wrong. When she used it, she hit him multiple times and would spank him and his siblings until she felt tired or felt like they had enough. Appellant got a "whooping" every day from someone in his family, but mostly from his mother.[46] Appellant was made fun of in school, and he remembered being teased and called a lot of names. The teasing

---

[44] Rep. R. vol. 44, 219.

[45] *Id.* at 221, 222.

[46] Rep. R. vol. 45, 57–58.

caused Appellant to fight often and get in trouble at school. Appellant's relationship with his father was up and down. Appellant used to call his father often, but it appeared that his father was avoiding him. Appellant stated that his mother instilled in him a lack of trust in others. As he got older, on top of feeling abandoned by his father, he started feeling abandoned by Twyla and Randy when their support of his activities in school sports started fading. Appellant also testified about his work history. Regarding his prior assault of Brooks, Appellant explained that he had to attend a batterers' intervention class. Appellant admitted that he falsely responded on a questionnaire for the class that his parents never hit him and he left the form blank where it asked if he would have liked help with controlling anger and violence in his marriage. Appellant claimed that he answered these questions this way because he feared losing custody of his daughter if he said that he came from a violent family, and he felt the other question was inapplicable because he was not married. Appellant explained that, in his relationship with Brooks, he felt he could control his anger if she left him alone; if he got angry and she did not leave him alone, he would get very angry and it is hard for him to calm down. He acknowledged that he becomes violent at some point if he gets angry. On cross-examination, Appellant stated that he has been an angry person for as long as he could remember and that he sometimes acts out in violence because he sometimes cannot control himself. Appellant testified that he would never kill anyone again, and that, if he was asked on the morning of the offense whether he would have killed Chanice, Annette, E.M., or his unborn son, he would not kill them either. However, he conceded that unfortunately he still killed them, and he agreed that actions speak louder than words.

Appellant's closing argument focused on his genetics, his brain, and his childhood environment and how those factors were out of his control. Indeed, counsel summed up his closing

argument by stating:

> Amos Wells does not want to be this way. He has no control. That ought to be mitigating. That ought to reduce his moral blameworthiness, which is exactly the instructions you've gotten. It ought to be sufficiently mitigating.[47]

Against Appellant's mitigation case, the State's punishment phase case primarily focused on establishing Appellant's future dangerousness from the facts of the offense, Appellant's history of violence, and the possibility of violence in the future should Appellant be sentenced to life without parole. While evidence of Appellant's future dangerousness is not directly in opposition to his mitigation evidence—indeed, Appellant's mitigation case was premised on a propensity for violence—all of the evidence is considered when deciding whether sufficient mitigating circumstances exist to spare a defendant from the death penalty. TEX. CODE CRIM. PROC. art. 37.071(e)(1) (jury to be instructed to answer "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.").

Accordingly, not only do we consider the mitigation case put forth by Appellant, we will also consider the case put forth by the State, in both the guilt phase and the punishment phase of trial, to determine if the evidence in favor of mitigation and the evidence against mitigation is so delicately balanced that the excluded six-hour portion of the interview room video would have been enough to tip the scales in Appellant's favor. In other words, would the video have moved the jury from a state of non-persuasion to a state of persuasion, such that its exclusion cannot be considered

---

[47] Rep. R. vol. 46, 66.

harmless? *Scott*, 227 S.W.3d at 690.

First, we note that while the evidence of the offense was presented during the guilt phase of trial and not the punishment phase, the jury in answering the mitigation question must consider "the circumstances of the offense." TEX. CRIM. PROC. art. 37.071(e)(1). Thus, the evidence of Appellant's guilt is an important consideration in the harmless error analysis. The evidence of his confrontation with Chanice at the Pate Street address; the medical evidence describing the multiple gunshot wounds that killed Chanice, Annette, E.M., and Chanice's unborn child; the 9-1-1 calls by Annette and the neighbors; Appellant's call to Brooks confessing what he had done; and Appellant's entering the Forest Hills police station asking to be put in jail and to be killed weighs heavily against a conclusion that Appellant was harmed by the exclusion of the six-hour portion of the interview room video.

In addition to the State's guilt phase evidence, the State's punishment case began with evidence of Appellant's history of violence against Brooks. Brooks testified about her relationship with Appellant, which began when they were in high school. The relationship was on and off and lasted two to three years. On January 5, 2008, Brooks and Appellant got into an argument when Appellant wanted to borrow her father's truck. He became violent, and Brooks locked him out of her apartment. Appellant kicked in the front door, punched and hit Brooks, kicked glass mirrors in the bedroom, and threw a chair out the window.

Fort Worth Police Detective Sidney Keith testified about his investigation into the assault, and pictures of the scene were published to the jury. When police responded, Brooks was "crying,

agitated, afraid and nervous."[48] Her ear was swollen, and she had "knots" on the back of her head from multiple punches.[49] Keith asked Brooks a series of questions from what is referred to as a "family violence packet," a certain set of questions intended to document the investigation.[50] Brooks responded that: Appellant had been violent toward her in the past; Appellant had access to firearms or weapons; she had been seriously injured by Appellant; things had recently gotten worse, more frequent, or more severe; Appellant had choked her; Appellant was unusually jealous or possessive or considered her his property; and Appellant had been violent when she talked about leaving him. She also responded that Appellant had a history of emotional problems and had, in the past, threatened to kill himself. On the other hand, Brooks answered that Appellant never threatened to kill her, never used or threatened to use a weapon against her, and did not abuse alcohol or drugs. Based on her responses, Keith found eleven out of twenty-three factors for family violence were present, showing a risk for escalation up to homicide or serious bodily injury.

As a result of the assault, Appellant was charged with assault against a family or household member; he pled guilty to Class A misdemeanor for assault causing bodily injury and was placed on twelve months' deferred adjudication.[51] According to Brooks, Appellant was required to take anger management classes.

Brooks testified that Appellant's pattern of abuse repeated itself during their relationship. She described another assault that occurred on the night of November 28, 2010, when Brooks was

---

[48] Rep. R. vol. 37, 22.

[49] *Id.* at 14.

[50] *Id.* at 17–18.

[51] Rep. R. vol. 48, State's Ex. 187.

visiting Appellant's aunt, Letrinda Lee. At the time, Brooks and Appellant had broken up. Although Brooks did not specifically recall what caused that particular breakup, she explained that they usually separated due to Appellant's cheating and assaults against her. While Brooks was with Letrinda, Appellant walked into Letrinda's house, grabbed Brooks from behind, and choked her. Appellant had the crook of his arm around Brooks's neck, and he dragged her outside. She blacked out and remembered waking up on the ground to Appellant beating her in the face. He "just stopped" hitting her, and then he cried and said he was sorry, which was typical of him.[52] The next thing Brooks remembered is that she was on the ground again in a field next to Letrinda's house, and Appellant was kicking her in the face with his work boots. Brooks went to the hospital with injuries to her mouth and lip and bruising to her arms and shoulders.

Appellant was charged with assault against a family or household member by impeding; he pled guilty to Class A misdemeanor assault causing bodily injury to a family member and was sentenced to fifteen days in the Tarrant County Jail.[53] The assault marked the end of Brooks's relationship with Appellant.

Brooks characterized Appellant as someone who is often irrational, becomes angrier and more violent than circumstances warrant, and has a hard time calming down. Appellant was either okay or out of his mind. Brooks further explained that there was no consistent pattern of what set Appellant off. While there was a lot of violence in their relationship before 2010, the violence ended after the November 2010 assault when they broke up for good. However, Appellant was still in Brooks's life because they had a daughter together. To prevent any future violence, Brooks had to

---

[52] Rep. R. vol. 37, 89.

[53] Rep. R. vol. 48, State's Ex. 186.

learn how to manage his anger. In her opinion, someone who had not learned to manage Appellant would never be safe.

The State moved on to evidence of Appellant's history of violence against Chanice. Tiffany Rose, a friend and former co-worker of Chanice, testified that she was concerned after seeing bruises and scratches on Chanice, and there was a time when Chanice missed work because she had a black eye. Rose also testified, over Appellant's objection, that there was a situation when she was called by Chanice, who was upset. Chanice and Appellant had gotten into an argument, and, when Chanice was brushing her teeth, Appellant slapped her. Chanice asked Rose not to call the police over this incident because Chanice did not want Appellant to go to jail. Rose encouraged Chanice to end the relationship with Appellant, but Chanice "kept going back."[54]

A co-worker of Appellant, Alejandro Castrillo, testified that one day at work Appellant was in the lunch room laughing at his cell phone. Appellant showed the phone to Castrillo and the other employees who were present, and Castrillo saw that Appellant was laughing at a video of people being "decapitated."[55] Castrillo clarified that the video showed "a man tied down to a chair, fingers in the right hand cut off, and he got his throat cut from left to right."[56] Castrillo assumed that the video was drug cartel related. Asserting that he knew the difference between reality and a movie, Castrillo believed that Appellant was watching a video that was real.

The State next presented evidence that, should Appellant be sentenced to life imprisonment without parole instead of the death penalty, he would be initially placed in the general prison

---

[54] Rep. R. vol. 37, 143.

[55] *Id.* at 158.

[56] *Id.*

population where he would be housed with offenders of all levels and come into contact with unarmed correctional officers and civilian staffers and volunteers. The State's last witness in its punishment case-in-chief was Dallas Theiss, an inmate who was serving a jail sentence at the Tarrant County Jail during the same time period that Appellant was awaiting trial in the instant case. Theiss testified about an incident when he was walking to the jail's dayroom. His path was blocked by Appellant, who was seated on a bench and had his feet propped up onto another table. Theiss stepped over Appellant's legs. Appellant told Theiss that he needed to say "excuse me," but Theiss felt it unnecessary to apologize because Appellant was at fault for having his legs in the way.[57] Appellant confronted Theiss and asked "do you want to do this in my cell or your cell?"[58] Later that day, Theiss was asked to speak with Appellant in a third party's cell. Theiss sat in the cell for about five minutes thinking that he and Appellant would simply "talk it out,"[59] when Appellant ran in and started swinging. The altercation lasted for about thirty seconds. Appellant had "busted [Theiss's] eye open" and his "jaw was messed up bad,"[60] and Theiss was eventually taken to the hospital. After being treated for the assault,[61] Theiss was moved into another jail facility.[62]

---

[57] Rep. R. vol. 38, 118.

[58] *Id.* at 121.

[59] *Id.* at 126.

[60] *Id.* at 124.

[61] During Appellant's testimony, on cross-examination Appellant denied assaulting Theiss, but he did admit to having a fight with another inmate because that other inmate "[came] at him with a towel on his hand." Rep. R. vol. 45, 155.

[62] The State presented two rebuttal witnesses after Appellant's punishment evidence: Catina Jacobs, a co-worker and friend of Appellant's father; and E.M.'s father, who was also Annette's

(continued...)

In closing argument, the State focused on the facts of the offense that were presented in the guilt phase, and the State reminded the jury about Appellant's history of violence against Brooks and the jail assault against Theiss. Regarding Appellant's mitigation evidence, the State argued that the expert testimony of Appellant's propensity for violence was aggravating, not mitigating. The State also pointed to the results of Appellant's cognitive testing, in which he performed normally, could make decisions, and had an average to above-average IQ. And while the State acknowledged evidence of Twyla's depression and paranoia and Appellant's feelings of abandonment and disappointment regarding his father, the State contended that these were insufficient reasons to spare Appellant the death penalty.

The jury heard and rejected Appellant's mitigation case that his propensity for violence was due to factors out of his control, the extensive evidence in support of that argument, and evidence that seemed to run against that argument but was possibly mitigating for other reasons.[63] On balance, and considering the overwhelming evidence supporting the jury's verdict, *Motilla*, 78 S.W.3d at 357, the video would not have been the feather that tipped the scales in his favor—it would not have moved the jury from a state of non-persuasion to a state of persuasion. *Scott*, 227 S.W.3d at 690. In light of the State's evidence, including the gravity of the offense in which Appellant killed Chanice, Annette, E.M., and Chanice's unborn child; Appellant's history of violence; and his potential for future violence; and Appellant's mitigation case and the evidence he presented, we are convinced, beyond a reasonable doubt, that the trial court's exclusion of the six-hour portion of the video did

---

[62](...continued) husband and Chanice's stepfather. Jacobs testified about a situation in which she advised Appellant not to get a gun. Photographs of Chanice, Annette, and E.M. were introduced through E.M.'s father.

[63] *E.g.*, testimony from Lewis or from Williams.

not contribute to the jury's verdict on the mitigation special issue and therefore Appellant's punishment.

### C(IV). The Video as Mitigating Evidence of Remorse

In his reply brief, Appellant argues that the exclusion of the full interview room video was not harmless because he was prevented from presenting valuable evidence of remorse and the State compounded the harm by emphasizing his lack of remorse. Specifically, Appellant points to the State's closing argument, in which the prosecution argued that Appellant's failure to "shed a tear" for the victims was an aggravating factor in favor of a death sentence.

We reject this argument for three reasons. First, while Appellant is correct that evidence of remorse is evidence that a fact finder can find mitigating,[64] he failed to preserve this claim because he did not make this remorse argument at trial. TEX. R. APP. P. 33.1. Second, Appellant's cited examples of remorse in his reply brief refer to video segments that the trial court did not exclude, i.e., his second interview with Barron,[65] which neither party offered at trial. The trial court specifically excluded only the six-hour video segment between interviews. Third, Appellant's contention, that the State's jury argument took advantage of the exclusion of the video, is not supported by the record. The State's argument, wherein it emphasized that Appellant did not "shed a tear," stated:

---

[64] *Lewis v. State*, 815 S.W.2d 560, 568 (Tex. Crim. App. 1991) (recognizing that "[r]emorse following commission of a serious crime may well be a circumstance tending in some measure to mitigate the degree of a criminal's fault"); *Renteria*, 206 S.W.3d at 697–98 (reversing and remanding for new punishment hearing where "constitutionally relevant mitigating evidence" of remorse was improperly excluded).

[65] Appellant's Reply Br. at 6 ("When Mr. Wells described what happened to the detective, he repeatedly broke down in tears and exhibited remorse. *See* DX 81 at 00:04:50; 00:04:53; 00:04:59; 00:05:03; 00:05:11.").

> Okay. You noticed that the Defendant never shed a tear, not a single tear unless you talked about his daughter. All right? He didn't shed a tear in describing what he saw when, if you use his words, came to. He didn't shed a tear. He didn't shed a tear about talking -- walking over Chanice, seeing what he did to [E.M.].[66]

The State's reference to Appellant's failure to "shed a tear" appears to be a reminder to the jury of Appellant's in-court testimony. Appellant testified during the punishment phase, and a reading of the record, cold as it is, indicates that the State's description of Appellant's testimony is accurate—there is no indication in the record that Appellant shed any tears when he testified about seeing the bodies of Chanice, Annette, and E.M.[67] Instead, during cross-examination, the following exchange took place:

> Q.    You know, you didn't cry a single time when you described shooting anybody.
> A.    You can -- you can say that, but --
> Q.    Well, that's true. You didn't.
> A.    I was hurting. It's -- you can say that.[68]

Based upon the cold record before us, the State's argument was in reference to Appellant's testimony and did not mislead the jury into believing that Appellant had never shed tears regarding the shootings at some other time, such as during the recorded interview with Barron.

### D. Conclusion

While the excluded video segment was relevant to the mitigation special issue, we conclude that any error in its exclusion was harmless. Better evidence of Appellant's post-offense mental state came in through a variety of other sources, and the exclusion of the video segment could not have

---

[66] Rep. R. vol. 46, 98.

[67] *See* Rep. R. vol. 45, 121–23.

[68] *Id.* at 162.

affected the jury on the mitigation issue. Appellant has not demonstrated a constitutional due process violation because the trial court's ruling did not prevent him from presenting the substance of his defense to the jury. *See Valle*, 109 S.W.3d at 507. The excluded video segment was not critical to Appellant's defense, and the trial court's exclusion of it did not deprive Appellant of a fundamentally fair trial. *Cf. Green v. Georgia*, 442 U.S. 95, 97 (1979) (holding due process violated when excluded testimony was highly relevant to critical punishment-phase issue); *Chambers*, 410 U.S. at 302–03 (holding defendant denied fair trial when trial court excluded critical evidence of, and witnesses to, another's confession, and refused cross-examination of recanting witnesses). Point of error four is overruled.

## IV. MITIGATION – GENETIC PREDISPOSITION

In his fifth through tenth points of error, Appellant asserts that the trial court violated his right to a fair trial when it prevented a behavioral genetics expert from testifying at the punishment phase that Appellant has six specific gene variants that increase his propensity for violence. Briefing his claims together, Appellant argues generally that the trial court misapplied the *Daubert/Kelly*[69] standard for admitting expert testimony when it found that the expert's opinion did not meet the scientific reliability standard.

### A. Background Facts

Appellant's mitigation presentation centered on a theory that his propensity for violence was due to genetic factors beyond his control. To that end, Appellant sought to introduce expert testimony from Dr. Pietro Pietrini, an Italian psychiatrist with a Ph.D. in neuroscience, who would

---

[69] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992).

testify that Appellant's genetic profile contains gene variants alleged to be associated with a significantly increased propensity for violent behavior.

At the State's request, the trial court conducted a *Daubert/Kelly* hearing on the proffered testimony pursuant to Rules of Evidence 702 and 705(b). At the hearing outside the jury's presence, Pietrini testified that he is qualified in the field of genetics to conduct surveys and statistical analyses on links between genes and behavioral issues. Pietrini explained that the increased propensity for violence associated with some gene variants is conditioned on having been raised in a negative or stressful childhood environment. Pietrini clarified, that if the childhood environment is a positive one, then there is no increased risk for violence, even if an individual has the identified gene variant. Pietrini opined that Appellant's DNA contains these environmentally sensitive gene variants that, in conjunction with Appellant's traumatic childhood,[70] have increased Appellant's propensity for violence. Pietrini's report referenced the underlying studies that informed his opinion. The State, in response, questioned Pietrini on his referenced sources and whether their underlying facts and data provided a sufficient basis for his opinion.

In relevant part, Pietrini's hearing testimony can be summarized as follows:

- Appellant has a variant of the 5HTTLPR gene that studies have associated with a predisposition to violent, antisocial, and impulsive behavior in the presence of stressful environmental conditions. Studies have linked this variant to increased vulnerability to anxiety and depression. On cross-examination, however, Pietrini acknowledged that one of the studies he cited as support for his opinion involved intoxication, which he did not

---

[70] Appellant presented testimony from various lay and expert witnesses regarding his childhood. While Appellant had no history of childhood physical abuse, Appellant witnessed domestic violence between his parents at a young age despite having no conscious memory of it. Appellant also experienced trauma when his father went to federal prison for tax fraud on Appellant's first day of kindergarten and when his parents later divorced after his father's release from prison. Appellant presented additional testimony that his mother and grandmother had long-term mental health problems that instilled in Appellant a lack of trust in others.

mention in his report. Another study found "limited evidence" to support Pietrini's conclusion.[71] Pietrini also acknowledged that one of his referenced sources warned that "notwithstanding the excitement that many researchers may have felt for the prospect of GXE, which is gene plus environment, there is growing evidence that we must be wary of these findings."[72] He acknowledged further warnings that the studies have been "fraught with problems with methodology and interpret[ation] flaws, including inconsistencies [in] the design risk of the genotypes, the environmental risk across the studies[,] and loose standards for replication."[73] And finally, Pietrini conceded that the studies (as with other studies referenced in Pietrini's report) have been conducted on predominantly Caucasian population groups (90 percent in one study; a "vast majority," possibly 95 percent, in another),[74] and that ethnicity is an important "moderator."[75]

- Appellant has a variant of the rs25531 gene that increases the risk for developing anxiety or other mental disorder. During the State's cross-examination of Pietrini as to this gene variant, a lengthy discussion took place between counsel and the trial court in which defense counsel conceded that this variant is not associated with violence and that Pietrini's referenced source did not study links to violence and aggression, and the State pointed out that Pietrini's reference studied links to obsessive-compulsive disorder.

- Appellant has a partial variant of the STin2 gene in which the variant studied has been associated with susceptibility to schizophrenia, obsessive-compulsive disorder, and anxiety. Pietrini acknowledged that the studied variant's connection to aggression was speculative only and that the research has not progressed much.

- Appellant has a variant of the rs4680 (COMT) gene that has been associated with impulsivity, aggression, and physical violence in persons with a negative childhood environment. Pietrini conceded, however, that the links to pronounced violent behavior were among patients with schizophrenia and schizoaffective disorder, which Appellant does not have. Pietrini also acknowledged that an underlying source cautioned that "the findings warrant further replication to avoid any spurious associations . . . due to ethnic stratification

---

[71] Rep. R. vol. 42, 163.

[72] *Id.* at 164.

[73] *Id.* at 165.

[74] *Id.* at 162–63, 167.

[75] *Id.* at 168.

effects and sampling errors."[76]

- Appellant has a partial variant of the rs1800955 gene in which the variant studied has been associated with a significantly increased risk for impulsivity and sensation-seeking behavior. Pietrini acknowledged that he had no study showing what effect Appellant's variant would have on an individual.

- Appellant has a partial variant of the DRD4-2/11 gene in which the studied variant has been associated with aggressive and hyperactive behavior that becomes more likely when coupled with a negative childhood. Pietrini conceded that he did not know what risk factor was posed by having Appellant's variant instead of the variant addressed in the studies. Moreover, he acknowledged that one of his referenced sources discussed impulsivity, not aggressiveness.

- In addition to discussing the genes individually, Pietrini postulated that a person with multiple gene variants associated with violence would be exponentially more prone to violence than a person with just one variant. He conceded, however, that there were no studies on this hypothesis; and, as the first person to propose it, he was still in the early data-gathering phase of his research.

At the close of the hearing, the trial court determined that Appellant did not meet the scientific reliability standard for admitting testimony on the contested gene variants.[77] Appellant now alleges that the trial court's exclusion of this evidence deprived him of a fair trial "because he was denied the right to present relevant and important mitigation evidence."[78]

**B. Applicable Law**

We noted in point of error four that the Eighth and Fourteenth Amendments require that the jury be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense. *Lockett*, 438 U.S. at 604; *Eddings*, 455 U.S. at 113–14.

---

[76] *Id.* at 177.

[77] The trial court allowed testimony on another environmentally sensitive gene variant (MAOA), which Appellant presented through a different witness, Dr. William Bernet. The propriety of admitting that testimony is not before us in this appeal, and we will not take any position on its admission.

[78] Appellant's Br. 85.

Regarding expert testimony, however, the Supreme Court requires as a precondition to admissibility that any and all scientific testimony or evidence be both relevant and reliable as determined by the trial court. *Daubert*, 509 U.S. at 589; *Kelly*, 824 S.W.2d at 572–73. The trial judge thus functions as a gatekeeper to determine the reliability, relevancy, and admissibility of scientific evidence. *Vela v. State*, 209 S.W.3d 128, 136 (Tex. Crim. App. 2006).

Consistent with this precedent, the Rules of Evidence set out three separate conditions before expert testimony can be admitted: "'(1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case.'" *Id.* at 131 (quoting *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006)). "These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance." *Id.*

Having found Pietrini qualified, the trial court's exclusion of the evidence centered on the second and third conditions—reliability and relevance. Under Rule 702, the proponent of scientific evidence must show by clear and convincing proof that the proffered evidence is sufficiently reliable and relevant to assist the jury in accurately understanding other evidence or in determining a fact in issue. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *Kelly*, 824 S.W.2d at 572–73. Unreliable scientific evidence is not helpful to the jury because it frustrates rather than promotes intelligent evaluation of the facts. *Kelly*, 824 S.W.2d at 572. Because the Rule 702 inquiry is case-specific and fact-intensive, the reliability determination is flexible, and it is the trial court as gatekeeper that must determine how to assess the reliability of particular testimony. *Vela*, 209 S.W.3d at 134. Courts have developed a non-exclusive list of factors that can be used to assess

reliability in various contexts, and the determination of which factors to apply often depends on whether the scientific testimony at issue falls within a "hard" or "soft" science, or some combination of the two. *See, e.g.*, *Morris v. State*, 361 S.W.3d 649, 654-55 (Tex. Crim. App. 2011) (discussing need to refrain from developing rigid distinctions between "hard" and "soft" sciences when distinction may be blurred).

When an expert's testimony is based on a hard science, i.e., involving precise calculations and the scientific method, we apply the test set forth in *Kelly* to evaluate reliability: (1) the underlying scientific theory must be valid, (2) the technique applying the theory must be valid, and (3) the technique must have been properly applied on the occasion in question. *Kelly*, 824 S.W.2d at 573. In *Kelly*, we identified a list of nonexclusive factors that could be used to make or assess a reliability determination.[79] These factors primarily address the soundness of the underlying scientific theory and technique.

In fields of study outside the hard sciences, i.e., behavioral sciences and psychology, we apply the more flexible *Nenno* test to evaluate reliability: "(1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field." *Nenno v. State*, 970 S.W.2d 549, 561 (1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999).

---

[79] Factors relating to the reliability determination include but are not limited to: (1) acceptance by the relevant scientific community, (2) qualifications of the expert, (3) literature concerning the technique, (4) the potential rate of error of the technique, (5) the availability of other experts to test and evaluate the technique, (6) the clarity with which the underlying theory or technique can be explained to the court, and (7) the experience and skill of the person applying the technique. *Kelly*, 824 S.W.2d at 573.

Under both *Daubert/Kelly* and *Nenno*, "reliability should be evaluated by reference to the standards applicable to the particular professional field in question." *Coble v. State*, 330 S.W.3d 253, 274 (Tex. Crim. App. 2010). Experts are given "wide latitude" in selecting their foundational sources; however, the trial court "must still evaluate those sources' reliability." *Vela*, 209 S.W.3d at 135 (discussing *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)). The trial court "need not 'admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Id.* at 136 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also* TEX. R. EVID. 705© ("An expert's opinion is inadmissible if the underlying facts or data do not provide a sufficient basis for the opinion.").

We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard, and we must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Weatherred*, 15 S.W.3d at 542.

**C. Analysis**

Pietrini's opinion relied on a string of unverifiable and subjective assumptions. For example, in one notable exchange, the trial court questioned whether there was a statistical error rate or whether the inquiry was just simply behavioral. Pietrini responded that "[w]hat we know from the literature is that there is a significant increased risk."[80] The trial court then asked, "when you say greater risk, that is statistically as best a description that you can give scientifically?"[81] Pietrini

---

[80] Rep. R. vol. 42, 136.

[81] *Id.* at 144.

responded, "Yes, your honor."[82] Further, when asked whether there was a consensus among the experts on the genetic link to violence, Pietrini acknowledged that there were only a relatively small number of studies and that the research had not progressed that much.

Regardless of whether we apply the test set forth in *Kelly* or *Nenno*, due to the subjectivity of Pietrini's opinion, the imprecision in measuring risk, and the early state of the research, the trial court appropriately found Pietrini's opinion scientifically unreliable. Pietrini did not properly rely on or utilize the principles involved in the field to conclude that Appellant has an increased propensity for violence. For example, in many instances, Pietrini alleged a link between a gene variant and a propensity for violence that his own foundational sources did not support. In other instances, Pietrini alleged Appellant had an increased propensity for violence based on studies conducted on distinguishable population groups, even though one study expressly warned about drawing conclusions from its findings on that basis.

In several instances, Pietrini opined that Appellant was predisposed to violence based on studies involving gene variants that Appellant only partially matched, only to concede on cross-examination that he did not know whether Appellant's partial match increased Appellant's predisposition to violence. Pietrini relied on another study to opine that Appellant was predisposed to violence but did not disclose in his report that the study expressly warned that GXE studies have been fraught with methodology problems and loose replication standards. That same study reported that many scientists now are "very skeptical regarding the credibility of gene plus environment

---

[82] *Id.*

findings."[83]

And finally, Pietrini's claim that a combination of the variants exponentially increases a person's propensity for violence was not supported by any studies at all. "Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Vela*, 209 S.W.3d at 134 (quoting *Viterbo*, 826 F.2d at 424).

### D. Conclusion

The trial court's ruling centered on the disconnect between the underlying studies and Pietrini's opinion that Appellant was predisposed to violence. The court identified multiple problems between the studies Pietrini submitted as foundational to his opinions, on the one hand, and their inapplicability to Appellant's claimed genetic propensity for violence, on the other. In sum, Pietrini's opinion lacked the foundational support and scientific reliability necessary to support expert testimony. As an unsupported opinion, Pietrini's proposed testimony did not serve the purposes for which it was offered, that is, objectively to assist the jury in assessing Appellant's personal moral culpability. The trial court did not abuse its discretion in excluding this evidence. Points of error five through ten are overruled.

## V. JURY PANEL FORMATION

In points of error eleven, twelve, and thirteen, Appellant alleges that the trial court erroneously denied his motion to quash the jury panel due to noncompliance with proper jury procedures. Appellant asserts specifically that "without a presiding judge and outside of [Appellant's] presence, the prospective jurors submitted juror cards and were granted purported disqualifications and excuses" in violation of proper jury procedures, the Sixth and Fourteenth

---

[83] *Id.* at 165.

Amendments to the United States Constitution, and Article I, Section 14 of the Texas Constitution.[84]

**A. Applicable Law**

Chapter 35 of the Texas Code of Criminal Procedure establishes the procedure by which jurors are to be called, qualified, and selected. "Generally, when prospective jurors are initially summoned, they are assembled in a general jury pool or general assembly." *Jasper v. State*, 61 S.W.3d 413, 422 (Tex. Crim. App. 2001). General assembly members are qualified on their ability to serve, and exemptions and excuses are heard and determined by the judge presiding over the general assembly—or by "the court's designee" in a case other than a capital felony case, pursuant to the plan adopted by the county commissioner's court. *Id*. at 423; Art. 35.03, § 2. Prospective jurors who are not disqualified, exempt, or excused are then divided into trial panels and sent to the individual courts trying the cases. *Jasper*, 61 S.W.2d at 423.

In a capital case, on the motion of a party, the trial court may alternatively call for a "special venire" pursuant to the procedures outlined in Chapter 34. Article 34.01 provides in pertinent part:

> A "special venire" is a writ issued in a capital case by order of the district court, commanding the sheriff to summon either verbally or by mail such a number of persons, not less than 50, as the court may order, to appear before the court on a day named in the writ from whom the jury for the trial of such case is to be selected. Where as many as one hundred jurors have been summoned in such county for regular service for the week in which such capital case is set for trial, the judge of the court having jurisdiction of a capital case in which a motion for a special venire has been made, shall grant or refuse such motion . . . and upon such refusal require the case to be tried by regular jurors summoned for service [that week.]

Art. 34.01; *see also Esquivel v. State*, 595 S.W.2d 516, 519–20 (Tex. Crim. App. 1980) (explaining Article 34.01's special venire procedures and holding that the trial judge's decision whether to order a special venire is "a matter within his discretion"). "In the case of a special venire called in a capital

---

[84] Appellant's Br. 87.

case," unlike a general assembly, the trial court "cannot designate others" to hear and determine excuses offered for not serving as a juror, including exemptions and disqualifications. *Chambers v. State*, 903 S.W.2d 21, 30 (Tex. Crim. App. 1995); *see also* Art. 35.03, § 2 (allowing for court's designee "in a case other than a capital felony case").

If a trial judge opts not to convene a special venire, Article 34.01 specifies that the case be tried by regular jurors summoned for service that week. In that situation, nothing in the plain language of Article 35.03 prevents a presiding general assembly judge from designating court personnel to make determinations with respect to prospective jurors who have yet to be assigned to any particular case. *Chambers*, 903 S.W.2d at 30. As we explained in *Chambers*, because prospective jurors in a general assembly have not been assigned to any particular case when determinations are made, "[t]here is no way of knowing what kind of case the prospective jurors would subsequently be assigned to, capital or noncapital." *Id.*

**B. Determining Excuses**

In point of error eleven, Appellant asserts that the method used to disqualify potential jurors in his case compromised the jury's integrity because the trial court did not follow the special venire procedures of Chapter 34. Appellant filed a timely motion requesting a special venire, but the trial court denied the motion. Appellant's jury panel was formed through the general assembly process. Appellant argues that the trial court's request for the jury bailiff to summon additional people constituted a *de facto* special venire. He contends that the court's overruling his request for a special venire "was an apparent attempt to deny [him] the rights specifically granted him by Article 35.03[,]

§ 2[.]"[85] He further contends that the jury bailiff, as the court's designee, violated special venire procedures when she heard and determined excuses instead of the judge. *See* Art. 35.03, § 2 (allowing a court's designee to hear and determine excuses in a case other than a capital felony case). Appellant filed a motion to quash the jury panel in which he raised these issues, and the trial court conducted a pre-trial hearing to address them.

The jury bailiff testified that she is the person in charge of summoning prospective jurors for the county and that it is her job to review prospective juror qualifications and make panel assignments to the various requesting courts. In a typical week, the jury bailiff would ordinarily summon 400 people, but this number varies depending on the requesting courts' needs. If a capital murder case is scheduled, then the jury bailiff would summon extra people. For the week of Appellant's trial, four jury panels had been requested by the various courts. Because the judge in Appellant's case requested a panel of 200 prospective jurors, the jury bailiff summoned 1200 people to cover the needs of all the requesting courts. Of the 1200 people summoned, 347 reported in person to the central jury room. The jury bailiff then decided exemptions and disqualifications in the general assembly before assigning panels to the requesting courts. Of the 347 people who appeared, the jury bailiff excused, deferred, or disqualified 38 people, leaving a total of 309 remaining prospective jurors for assignment to a panel, 200 of whom would be assigned to Appellant's panel.

At the hearing's conclusion, in response to Appellant's *de-facto*-special-venire position, the State argued that a similar claim was previously raised and rejected in a recent case before the same trial court. The State pointed out that this Court on appeal held that the procedure did not create a

---

[85] Appellant's Br. 90.

special venire.[86] The trial court denied Appellant's motion to quash the jury panel. We, too, reject Appellant's contention that the trial court's request for a panel of 200 in his case was in effect a request for a special venire, or that it imposed the procedural requirements of a special venire on the general assembly. The bailiff's hearing of preliminary qualifications occurred before the final 309 prospective jurors were divided into panels and assigned to specific courts or cases. The subsequent assignment of 200 to serve on Appellant's panel did not convert the general assembly proceedings into a special venire. *See Chambers*, 903 S.W.2d at 30. The trial court did not err in denying Appellant's motion to quash the jury panel. Point of error eleven is overruled.

### C. Right to be Present

In his twelfth and thirteenth points of error, Appellant asserts that the failure to provide Appellant and his attorneys the right to be present for prospective juror exemptions and qualifications violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 14, of the Texas Constitution. He states that the general assembly in which exemptions were determined is a critical stage of the criminal proceeding and Appellant and his attorneys were entitled to be present.

We have repeatedly held that jury panel formation during the general assembly is not part of a defendant's "trial" and therefore the accused is not entitled to be present. *Jasper*, 61 S.W.3d at 423; *Chambers*, 903 S.W.2d at 31. Nor are the accused's attorneys entitled to be present. *Moore v. State*, 999 S.W.2d 385, 399 (Tex. Crim. App. 1999) (rejecting challenge to qualification of jurors during general assembly outside the presence of both counsel and the defendant). We decline to revisit the

---

[86] Specifically, the State referred to our decision in *Hummel v. State*, No. AP-76,596, 2013 WL 6123283 at *6 (Tex. Crim. App. Nov. 20, 2013) (not designated for publication).

issue. Points of error twelve and thirteen are overruled.

We affirm the judgment of the trial court.

Delivered: November 18, 2020
Publish